1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10   ROBERT and LORI WOODS,
                                        1:06-CV-00398-SMS
11
                    Plaintiffs,         ORDER GRANTING DEFENDANTS'
12                                      MOTIONS FOR SUMMARY JUDGMENT
     vs.                                (DOCS. 38 AND 52)
13
     PROTECTION ONE ALARM               ORDER RE: PROTECTION ONE ALARM
14   MONITORING, INC., and ASSET        MONITORING'S OBJECTIONS TO
     RESOURCES, INC.,                   EVIDENCE AND REQUEST TO STRIKE
15                                      EVIDENCE IN OPPOSITION TO
                    Defendants.         MOTION FOR SUMMARY JUDGMENT
16   _____/  (DOC. 62-2)

17                                      ORDER RE: PROTECTION ONE ALARM
                                        MONITORING'S REQUEST & AMENDED
18                                      REQUEST FOR JUDICIAL NOTICE
                                        (DOCS. 52-7, 62-3)
19

20        Plaintiffs are proceeding with a civil action in this

21   Court. By order dated August 30, 2006, entered upon the parties'

22   consent, Judge Oliver W. Wanger assigned this action to the

23   undersigned Magistrate Judge for all proceedings, including the

24   entry of final judgment, pursuant to 28 U.S.C. § 636(c), Fed. R.

25   Civ. P. 73(b), and Local Rule 73-301.

26        I. <u>Introduction</u>

27        Pending before the Court for determination are two motions

28   for summary judgment filed by Defendants Protection One Alarm

                                  1

Monitoring, Inc. (POAM) and Asset Resources, Inc. (AR), respectively, along POAM's objections to evidence and request to strike evidence filed in opposition to its motion for summary judgment, and POAM's request and amended request for judicial notice.

Defendant AR filed its motion for summary judgment and memorandum of points and authorities on March 2, 2007. On April 26, 2007, Plaintiff filed a memorandum with affidavits of Michael Pekin, Shirley Hable, and Plaintiff Lori Woods and related exhibits in opposition to Defendant AR's motion. On May 21, 2007, further briefing and filing of legible and authenticated copies were ordered concerning exhibits submitted by AR. AR filed a reply on May 30, 2007, including a memorandum and numerous declarations and affidavits as well as cross-references and exhibits.

Defendant POAM filed a motion for summary judgment on April 30, 2007, including a memorandum of points and authorities, statement of undisputed facts, request for judicial notice, and declarations of Mary Moorman, Steven Petersen, and Alexander J. Harwin. Plaintiff filed opposition to this motion on May 10, 2007, including a memorandum and the affidavits of P. Michael Pekin, Plaintiff Lori Woods, Barbara Williamson, and Shirley Hable and related exhibits. On June 7, 2007, POAM filed a reply, including a memorandum, objections to evidence and request to strike, and an amended request for judicial notice.

The hearing on the motions was held on Friday, June 15, 2007, before the Honorable Sandra J. Snyder, United States Magistrate Judge. Plaintiffs were represented by Attorney

Michael Pekin, who was present in court. Attorney Christopher J. Mundt, representing Defendant Asset Resources, Inc., appeared telephonically; and Alexander J. Harwin, representing Protection One Alarm Monitoring, Inc., was present in court. After argument, the matter was taken under submission.

    II. Background

    This is a an action originally filed in state court on August 19, 2003. It was removed from the Superior Court of the State of California, County of Merced on April 6, 2006, based on diversity of citizenship. In ruling on both Defendants' motions to dismiss on December 21, 2006, this Court dismissed the claims for breach of contract, violation of the California Consumer Credit Reporting Agencies Act, and the breach of contract by commission of the common law tort of libel. Plaintiffs' action now consists of a single claim for defamation against the Defendants POAM and AR.

    The gist of the defamation consists of the continued presence in Equifax credit reports of derogatory information that was initially mistakenly furnished to Equifax by the Defendants. When notified by Plaintiffs of the incorrect information, Defendants investigated and communicated the mistake to Equifax. Equifax incorrectly informed Defendants that the matter had been corrected in Equifax's data bank, when in reality the derogatory information continued to be in Equifax's data bank because of Equifax's data processing error.

    The record reveals that after this matter was filed in Merced County Superior Court in August 2003, Plaintiffs conducted no depositions and very little written discovery.

During this time, POAM conducted depositions, one in Fargo, North Dakota, and two in Atlanta, Georgia. Plaintiffs did not appear personally at any of the depositions but did appear telephonically for the Atlanta depositions.

At the February 12, 2007, scheduling conference, the Court ordered Plaintiffs to conduct some type of discovery as to Defendant AR on or before March 1, 2007. Up to the time of the scheduling conference, the record reveals that Plaintiffs failed to serve AR with discovery requests of any nature. AR states that Plaintiffs have failed and refused to serve upon Defendant AR any discovery requests since the date of filing of this case. (AR Mot., Doc. 38, p. 5-6.)[1]

III. Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It is the

---

[1] On March 2, 2007, one day after AR filed their motion for summary judgment, Plaintiffs served a set of special interrogatories on AR, and AR promptly answered. Interrogatories 15, 16, 17, and 18 are attached to Plaintiffs' opposition to AR's summary judgment motion, and Plaintiffs contend that the answers provided are evasive and do not reveal whether or how AR or POAM authorized the removal of the derogatory entry from the Equifax listing. AR answered by referring Plaintiffs to their motion for summary judgment, which shows how the derogatory was removed. Plaintiffs' filing of the interrogatories at the last moment, after years of inaction, brought about problems for both Plaintiffs and Defendants.

moving party's burden to establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978).

Where a party with the ultimate burden of persuasion at trial as to a matter moves for summary judgment, it must demonstrate affirmatively by evidence each essential element of its claim or affirmative defense and must establish that there is no triable issue of fact as to each essential element such that a rational trier of fact could render a judgment in its favor. Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003). If a party moves for summary judgment with respect to a matter as to which the opposing party has the ultimate burden of persuasion at trial, then the moving party must show that the opposing party cannot meet its burden of proof at trial by establishing that there is no genuine issue of material fact as to an essential element of the opposing party's claim or defense; the moving party must meet the initial burden of producing evidence or showing an absence of evidence as well as the ultimate burden of persuasion. Nissan Fire Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the opposing party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990)). In order to carry its ultimate burden

of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. Id.

However, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 323. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, it is the opposing party's obligation to produce a factual predicate from which an inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987). Although the Court must not weigh the evidence, the Court must draw

reasonable inferences; evidence that is too insubstantial or speculative may be insufficient to establish the existence of a genuine issue of material fact. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1255 (9th Cir. 1982); Dept. of Commerce v. U.S. House of Rep., 525 U.S. 316, 334 (1999). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. Anderson, 477 U.S. at 251-52. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Id. at 587.

    The showings must consist of admissible evidence, Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980), or pleadings, depositions, answers to interrogatories, admissions, and affidavits or declarations, Fed. R. Civ. P. 56(c). Affidavits shall be based on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e). Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. Id. Declarations pursuant to 28 U.S.C. § 1746 may be used with the same force and effect as affidavits. Pollock v. Pollock, 154 F.3d 601, 611, n.20 (6th Cir. 1998). Personal knowledge may be inferred from declarations themselves, such as

from facts concerning a declarant's position and participation, Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990); however, a court cannot draw an inference about facts not specifically put in the record by a party, and a court will not assume that general averments embrace specific facts needed to sustain a complaint, Lujan v. National Wildlife Federation, 497 U.S. 871, 887 (1990). Unauthenticated documents cannot be considered on a motion for summary judgment. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1990). Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

The Court is not obligated to consider matters that are in the record but are not specifically brought to its attention; the parties must designate and refer to specific triable facts. Even in the absence of a local rule, for evidence to be considered, the party seeking to rely on it must specify the fact by indicating what the evidence is or says and must indicate where it is located in the file. Although the Court has discretion in appropriate circumstances to consider other material, it has no duty to search the record for evidence establishing a material fact. Carmen v. San Francisco United School Dist., 237 F.3d 1026, 1029 (9th Cir. 2001).

A party moving for summary judgment is entitled to the benefit of any relevant presumptions that support the motion provided that the facts giving rise to the presumption are undisputed. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1254

1    (9th Cir. 1982).

2        IV. POAM'S MOTION FOR SUMMARY JUDGMENT

3        Defendant POAM argues that Plaintiffs' state defamation

4    claim is preempted by federal statute, and that thus Defendant

5    POAM is entitled to judgment as a matter of law because

6    Plaintiffs cannot prove elements of their claim as to which they

7    have the burden of proof.

8        A. Preemption

9        Defendant POAM argues that the Fair Credit Reporting Act

10   (FCRA) preempts Plaintiffs' state claim for defamation.

11            1. Applicable Law

12       Review of the pertinent provisions of the FCRA reveals that

13   within the statutory context, this case involves Defendants who

14   were furnishers of information pursuant to the FCRA. Defendants

15   are included in the statute's definition of persons, which

16   expressly includes any individual or entity. 15 U.S.C.

17   §1681a(b). Defendants furnished information to Equifax, which

18   qualifies as a consumer reporting agency (CRA) as defined by §

19   1681a(f):

20           The term "consumer reporting agency" means any
     person which, for monetary fees, dues, or on a
21   cooperative nonprofit basis, regularly engages in
     whole or in part in the practice of assembling or
22   evaluating consumer credit information or other
     information on consumers for the purpose of furnishing
23   consumer reports to third parties, and which uses any
     means or facility of interstate commerce for the
24   purpose of preparing or furnishing consumer reports.

25   A consumer report is defined by a 1681a(d):

26       (d) Consumer report.

27       (1) In general.

28           The term "consumer report" means any written,

10

oral, or other communication of any information by a
consumer reporting agency bearing on a consumer's
credit worthiness, credit standing, credit capacity,
character, general reputation, personal
characteristics, or mode of living which is used or
expected to be used or collected in whole or in part
for the purpose of serving as a factor in establishing
the consumer's eligibility for-
(A) credit or insurance to be used primarily for personal,
family, or household purposes;
(B) employment purposes; or
(C) any other purpose authorized under section 1681b
of this title.

The duties of furnishers of information to consumer

reporting agencies (CRA's) are set out at 15 U.S.C. § 1681s-2.

Furnishers are prohibited from reporting information relating to

a consumer to a CRA if the furnisher knows or has reasonable

cause to believe that the information is inaccurate. § 1681s-

2(a)(1)(A). "Reasonable cause" means having specific knowledge,

other than solely allegations by the consumer, that would cause

a reasonable person to have substantial doubts about the

accuracy of the information. § 1681s-2(a)(1)(D). Furnishers

shall not furnish information relating to a consumer to any CRA

if the person has been notified by the consumer that specific

information is inaccurate, and the information is, in fact,

inaccurate. § 1681s-2(a)(1)(B).

Furnishers also have a duty to correct and update

information. The statute provides that a furnisher who regularly

and in the ordinary course of business furnishes information to

CRA's about the furnisher's transactions or experiences with any

consumer, and who further has furnished to a CRA information

that the person determines is not complete or accurate, shall

promptly notify the CRA of that determination and provide any

corrections or additional information to correct and complete

11

the information, and shall not thereafter furnish the agency
with any information that remains not complete or accurate. §
1681s-2(a)(2). If a consumer disputes the completeness or
accuracy of any information furnished by a furnisher to any CRA,
the furnisher may not furnish the information to any CRA without
notice that the information is disputed by the consumer. §
1681s-2(a)(4).

The ability of the consumer to dispute information directly
with the furnisher is governed by regulations, but the statute
sets forth the procedure to be followed regarding information
disputes:

> (D)  Submitting a notice of dispute
>
> A consumer who seeks to dispute the accuracy of
> information shall provide a dispute notice directly
> to such person at the address specified by the person
> for such notices that–
> (i) identifies the specific information that is being
> disputed;
> (ii) explains the basis for the dispute; and
> (iii) includes all supporting documentation required
> by the furnisher to substantiate the basis of the dispute.
>
> (E)  Duty of person after receiving notice of dispute
>
> After receiving a notice of dispute from a consumer
> pursuant to subparagraph (D), the person that provided
> the information in dispute to a consumer reporting
> agency shall–
> (i) conduct an investigation with respect to the
> disputed information;
> (ii) review all relevant information provided by the
> consumer with the notice;
> (iii) complete such person's investigation of the
> dispute and report the results of the investigation
> to the consumer before the expiration of the period
> under section 1681i(a)(1) of this title within which
> a consumer reporting agency would be required to complete
> its action if the consumer had elected to dispute the
> information under that section; and
> (iv) if the investigation finds that the information
> reported was inaccurate, promptly notify each consumer
> reporting agency to which the person furnished the
> inaccurate information of that determination and provide

1    to the agency any correction to that information that
2    is necessary to make the information provided by the
person accurate.

3  15 U.S.C. § 1681s-2(a)(8)(D)-(E).

4    Title 15 U.S.C. 1681s-2(b) sets out the duties of

5 furnishers of information upon receipt of notice from a consumer

6 reporting agency of a dispute as to information. After such

7 notification, the furnisher of information is required to

8 investigate within time limits to determine the accuracy or

9 completeness of the information previously provided to the CRA.

10 The furnisher must report the results of the investigation to

11 the CRA and to other nationwide CRA's to whom the furnisher had

12 furnished the information, and must modify, delete, or block

13 reporting of information that is accurate, incomplete, or cannot

14 be verified.

15    The basis for the state law defamation action in the

16 present case is Plaintiffs' claim that Defendants furnished

17 inaccurate derogatory information to Equifax. Defendants, who

18 furnished information to Equifax, a CRA, are furnishers of

19 information within the scope of the statute. Therefore,

20 subsection (a) of §1681s-2 applies.

21    With respect to enforcement of the statutory provisions, §

22 1681s-2(c) limits liability by providing that except as provided

23 in § 1681s(c)(1)(B) (which authorizes the states, in addition to

24 other remedies as provided under state law, to designate an

25 officer to bring an action to enjoin violations or to sue on

26 behalf of state residents to recover damages for wilful or

27 negligent violations of the statute, and which confers upon

28 federal regulators the right to intervene in such actions and

remove them for federal court), the provisions recognizing an injured individual's right of recovery for negligent or wilful violations of the statute do not apply to any violation of § 1681s-2(a) (the portion of the statute that concerns the duties of furnishers of information before notification from a CRA of a dispute). Title 15 U.S.C. § 1681s-2(d) provides that the provisions of law described in § 1681s-2(a) shall be enforced exclusively under § 1681s of the title by federal agencies and officials and the state officials identified in that section. See, 15 U.S.C. § 1681s(c).

Further, the FCRA contains two preemption sections restricting state law claims that apply to persons who furnish information under the FCRA.

The general preemption section at 15 U.S.C. § 1681t(b)(1)(F) states, in pertinent part, as follows:

(b) General exceptions

No requirement or prohibition may be imposed under the laws of any State --

(1) with respect to any subject matter regulated under-

. . .

(F) section 1681s-2 of this title relating to the responsibilities of persons who furnish information to consumer reporting agencies...(emphasis added).

This general provision provides complete preemption of the state law claims here if it applies.

The original preemption provision is set out at 15 U.S.C. § 1681h(e), and it provides in pertinent part:

Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or

14

negligence with respect to the reporting of
information against... any person who furnishes
information to a consumer reporting agency... based on
information disclosed by a user of a consumer report
to or for a consumer against whom the user has taken
adverse action... except as to false information
furnished with malice or willful intent to injure such
consumer.

There is no Ninth Circuit authority attempting to reconcile
the two apparently conflicting preemption statutes, i.e.,
1681t(b)(1)(F) and 1681h(e). Three different approaches have
developed to reconcile these statute sections.

First Approach - Some courts have held that §
1681t(b)(1)(F) completely subsumes § 1681h(e) because it
provides absolute preemption and was added after § 1681h(e).
Further, when a specific statute carves out an exception to a
general statute, the specific statute will not be controlled or
nullified by the general one, regardless of the priority of the
enactment. Cisneros v. Trans Union, LLC, 293 F.Supp.2d 1167,
1174, 1177 (D.Hawaii 2003). See also, Trout v. BMW of North
America, 2007 WL 602230 (D.Nev. 2007)(furnishers of information
cannot provide inaccurate information, but if they do, any state
statutory and common law causes of action brought as a result of
this conduct are preempted by the FCRA); Cope v. MBNA America
Bank, N.A., 2006 WL 655742 (D.Or. 2006)(the plain language of §
1681t(b)(1)(F) precludes Plaintiff's defamation claim because
that claim would constitute a prohibition imposed under the laws
of a State relating to the responsibilities of persons who
furnish information to the CRA's); Jaramillo v. Experian
Information Solutions, Inc., 155 F.Supp.2d 356, 361 (E.D.Pa.
2001)(the plain language of § 1681t(b)(1)(F) clearly eliminated

all state causes of action against furnishers of information, not just ones that stem from statutes that relate specifically to credit reporting).

Second Approach - Other district courts have determined that § 1681t(b)(1)(F) does not preempt common law tort claims, and such claims may be brought but have reached this conclusion by two different avenues.

The first group contends that 1681t(b)(1)(F) applies to state statutes only, and that § 1681h(e) applies to common law torts. A discussion of this rationale is set out in McCloud v. Homeside Lending, 309 F.Supp.2d 1335, 1341 (N.D.Ala. 2004); and Jeffery v. Trans Union, LLC, 273 F.Supp.2d 725, 726-28 (E.D.Va. 2003)(holding that § 1681h(e), not § 1681t(b)(1)(F), applies to the defamation action, so if a plaintiff pleads malice or willful intent to injure, the action for violation of a state statute is not preempted).

The second group adheres to the rationale that § 1681h(e), as the specific preemption clause, trumps the more general language of § 1681t(b)(1)(F). Therefore, if the consumer properly alleged malice, that is, gross negligence or willful intent to injure, on the part of the furnisher of credit information, the FCRA does not preempt a common law claim for defamation. See Cisneros v. Trans Union, LLC, 293 F.Supp.2d at 1175 (discussing the various approaches to preemption); Yutesler v. Sears Roebuck and Co., 263 F.Supp.1209, 1211-12 (D.Minn. 2003); McCloud v. Homeside Lending, 309 F.Supp.2d 1335, 1342 (N.D.Ala. 2004), and cases cited there.

Under either rationale, plaintiffs who overcome §

16

1681h(e)'s malice/willful intent standard may pursue common law actions against furnishers of information. Those who reject these interpretations do so because it greatly minimizes the applicability of § 1681t(b)(1)(F) and fails to interpret the statute as a whole.

Third Approach - This approach applies a temporal formula to the FCRA's preemption sections based on § 1681t(b)(1)(F)'s absolute immunity for any matter regulated by § 1681s-2, which sets out the responsibilities of furnishers of information. Under this rationale the furnisher's conduct must be broken down into two discrete time periods: (1) The time period between when the debt was incurred and the time the furnisher receives notice from the CRA that the conduct is in dispute, and (2) the time period after notice of the dispute had been received.

The first time period is applicable if the furnisher communicates inaccurate information to a CRA before it receives notice of a dispute from the CRA. At that point, proponents of this rationale contend that the conduct is not regulated under § 1681s-2 and thus is not regulated by § 1681t(b)(1)(F) and is not preempted. Such claims must be analyzed for preemption under §1681h(e).

If inaccurate information is furnished after notice is received, such conduct falls within § 1681s-2(a)(1)(B), and the action would be completely preempted by 1681s-2. Title 15 § 1681h(e) governs preemption of state law claims premised on the furnisher's behavior *before* receipt of notice, because at that point § 1681s-2 is not implicated. Malm v. Household Bank (SB) NA, 2004 WL 1559370 (D.Minn. 2004). See also Mattice v. Equifax,

17

1   2003 WL 21391679 (D.Minn. 2003); Aklaqi v. Nationscredit

2   Financial, 196 F.Supp.2d 1186, 1194 (D.Kan. 2002). There are no

3   Ninth Circuit or district courts in the Ninth Circuit following

4   this temporal approach. Those courts who reject the temporal

5   approach find nothing in the preemption statutes drawing a

6   distinction of two time periods, and find the time period

7   analysis strained, at best. Further, those rejecting this

8   approach contend that it ignores the requirements of the more

9   specific preemption provisions.

10      Most of the district courts in the Ninth Circuit have held

11  that the FCRA preempts state statutory and common law causes of

12  action which fall within the conduct proscribed under § 1681s-2.

13  See Trout v. BMW of North America, 2007 WL 602230 (D.Nev.

14  2007)(furnishers of information cannot provide inaccurate

15  information, but if they do, any state statutory and common law

16  causes of action brought as a result of this conduct are

17  preempted by the FCRA); Cisneros v. Trans Union, LLC, 293

18  F.Supp.2d 1167, 1174, 1177 (D.Hawaii 2003)(consumer could not

19  maintain private cause of action against furnishers of credit

20  information for failing to provide accurate information;

21  consumer's defamation claim that furnishers of credit

22  information supplied false and inaccurate information with

23  reckless disregard could only be pursued by governmental

24  agencies or officials under the FCRA); Davis v. Maryland Bank,

25  N.A., 2002 WL 32713429 (N.D.Cal. 2002) (defamation claim

26  preempted under FCRA under 1681t(b)(1)(F), and § 1681h(e)

27  applies only to conduct not governed by § 1682t(b)(1)(F);

28  § 1681h(e) applies only to conduct which is not governed by §

18

1681s-2(1)(a)-(b)); and <u>Roybal v. Equifax</u>, 405 F.Supp.2d 1177,
1179-1180 (E.D.Cal. 2005) (a private right of action against a
furnisher of credit information exists only if the disputatious
consumer in the first instance notifies the CRA, which in turn
must investigate and, upon the claim's being deemed viable, must
contact the furnisher, whose duty to investigate arises only
upon receiving notice of the viable claim from the CRA directly;
one who has not alleged such facts lacks standing to bring a
private right of action against a furnisher of information).

The court in <u>Nelson v. Chase Manhattan Mortgage Corp.</u>, 282
F.3d 1057, 1060 (9th Cir. 2002) addressed how the provisions of
the FCRA applied to those who furnish credit information to
credit reporting agencies. There, the Ninth Circuit stated:

> What we have to decide is whether sections 1681n and
> 1681o permit suit against a furnisher of credit
> reporting information that violates the duties imposed
> under section 1681s-2....[2]
> ...
> Most of the provisions of § 1681s-2(a)are for the
> protection of consumers. There would be no doubt that
> a consumer could sue for their violation under
> sections 1681n & o were it not for §§ 1681s-2(c) and
> (d). Subsection (c) expressly provides that sections
> 1681n & o "do not apply to any failure to comply with
> subsection (a) of this section, except as provided in
> section 1681s(c)(1)(B) of this title." . . . This
> limitation on liability and enforcement is reinforced
> by subsection (d) of § 1681s-2, which provides that
> subsection (a) "shall be enforced exclusively under
> section 1681s of this title by the Federal agencies
> and officials and the State officials identified in
> that section." Consequently, private enforcement under
> §§ 1681n & o is excluded.

282 F.3d at 1059. After consideration of related provisions, the
court further concluded:

---

[2] The FCRA imposes civil liability on any person who willfully or negligently
fails to comply with the Act's requirements with respect to any consumer. 15 U.S.C.
§ 1681n (willful noncompliance), § 1681o (negligent noncompliance).

It can be inferred from the structure of the statute
that Congress did not want furnishers of credit
information exposed to suit by any and every consumer
dissatisfied with the credit information furnished.
Hence, Congress limited the enforcement of the duties
imposed by § 1681s-2(a) to governmental bodies. But
Congress did provide a filtering mechanism in §
1681s-2(b) by making the disputatious consumer notify
a CRA and setting up the CRA to receive notice of the
investigation by the furnisher. See 15 U.S.C. §
1681i(a)(3) (allowing CRA to terminate reinvestigation
of disputed item if CRA "reasonably determines that
the dispute by the consumer is frivolous or
irrelevant"). With this filter in place and
opportunity for the furnisher to save itself from
liability by taking the steps required by §
1681s-2(b), Congress put no limit on private
enforcement under §§ 1681n & o.

282 F.3d at 1060.

In Roybal v. Equifax, 405 F.Supp.2d 1177, 1179 (E.D.Cal.
2005), the court held that consumers could not bring a private
action against a furnisher of credit information unless they
alleged they had first contacted the credit reporting agency and
that the agency had in turn contacted the furnisher of the
information, thereby triggering a duty to investigate. The court
cited and relied upon Nelson. 405 F.Supp.2d at 1179. It held
that a private right of action against a furnisher of credit
information exists only if the consumer notifies the CRA in the
first instance; the furnisher's duty to investigate does not
arise until the furnisher receives notice of the dispute from
the CRA directly. 405 F.Supp.2d at 1180.

Thus, because bypassing the filter and contacting the
furnisher of credit information directly does not actuate the
furnisher's obligation to investigate, and does not give rise to
a private right of action. See Nelson, 282 F.3d at 1060; Roybal,
405 F.Supp.2d at 1180. It is this approach which the Court will

1   apply in the present case.

2            2. <u>Analysis</u>

3      POAM argues that Plaintiffs' defamation cause of action is

4   preempted under the FCRA pursuant to § 1681t(b)(1)(F), which

5   preempts all state claims which regulate the responsibilities of

6   persons who furnish information to consumer reporting agencies.

7   It also argues that under the provisions of § 1681h(e),

8   Plaintiffs have failed to show malice as required by that

9   statute. POAM argues that there is no evidence of hatred or ill

10   will on the part of POAM; therefore, the action is preempted.

11      Plaintiffs' response consists of one paragraph wherein they

12   contend that they have alleged and proved malice, and the

13   complaint for libel can go forward. Plaintiffs cite <u>Gorman v.</u>

14   <u>Wolpoff & Abramson, LLP</u>, 370 F.Supp.2d 1005 (N.D.Cal. 2005) in

15   support of this position. Plaintiffs are correct in stating that

16   under § 1681h(e), a libel action may be maintained so long as

17   malice can be proved. However, <u>Gorman</u> also states, that no

18   private right of action exists to redress violations of 1681s-

19   2(a), and therefore the § 1681n and § 1681o claims can survive a

20   motion to dismiss only if they can be based on willful or

21   negligent violations of § 1681s-2<u>(b)</u>. 370 F.Supp.2d at 1012.

22      Plaintiffs here claim only that AR and POAM failed to

23   provide accurate information and allegedly failed to correct and

24   update the information; Plaintiffs have not alleged or presented

25   evidence warranting an inference that Defendants received notice

26   of a dispute from Equifax, or that Defendants' duties as

27   furnishers were activated in the manner required by statute in

28   order for a claim to be stated. Plaintiffs have stated a claim

under 1681s-2(a), and such claims can only be enforced by federal and state officials. It is only when Plaintiffs allege violations of 1681s-2(b) that a private right of action arises.

This interpretation is in line with the reasoning of <u>Nelson v. Chase Manhattan Mortgage Corp.</u>, 282 F.3d 1057, 1060 (9th Cir. 2002), which addresses both § 1681h(e) and § 1681t(b)(1)(F), and gives a balanced interpretation of the statutes. Under <u>Nelson</u>, Plaintiffs may bring a defamation action against the two named furnishers of information under § 1681s-2(a), but only if they first follow the requirements of § 1681s-2 by proceeding to make use of the filtering mechanism. The consumer who is dissatisfied with the credit information furnished must notify the CRA, here Equifax, thereby setting up the CRA to receive notice of the dispute. 15 U.S.C. § 1681i(a)(3). Upon notice from the CRA, the furnisher must conduct an investigation of the dispute. This gives the furnisher an opportunity to save itself from liability by taking the steps required by § 1681s-2(b). Once these steps are taken, the consumer is free to file an action for private enforcement under §§ 1681n & o. <u>Nelson v. Chase Manhattan Mortgage Corp.</u>, 282 F.3d at 1060. This interpretation is also in line with <u>Roybal v. Equifax</u>, 405 F.Supp.2d 1177 (E.D.Cal. 2005).

In agreement, see <u>Cisneros v. Trans Union, LLC</u>, 293 F.Supp.2d 1167, 1174 (D.Hawaii 2003); <u>Gorman v. Wolpoff & Abramson, LLP</u>, 370 F.Supp.2d 1005, 1012 (N.D.Cal. 2005); <u>Pirouzian v. SLM Corp.</u>, 396 F.Supp.2d 1124, 1127 (S.D.Cal. 2005).

Thus, in order for Plaintiffs to state a defamation claim against Defendants, both furnishers of information, Plaintiffs

22

must have first contacted Equifax who, in turn, would notify the furnisher of the information. This notice triggers the furnisher's duty to investigate and follow the duties set out in § 1681s-2(b)(1).

Plaintiffs do not allege, nor does the record reveal, that either Plaintiff ever contacted Equifax about the alleged false information in a credit report. (Harwin Decl. Ex. S, Dep. of Lisa Willis, supervisor of office of consumer affairs of Equifax p. 13:12-25, 14:1-20). Plaintiffs here concede that they did not contact Equifax in an attempt to clear the derogatory credit information from their account. Indeed, Plaintiffs continue to allege that, aside from POAM and AR, they had no other avenues open to them to remove the outstanding collection from the Equifax credit report from the date of discovery on June 19, 2003. However, Willis testified that there were numerous agents available at Equifax to take telephone calls from consumers. (Id. pp. 10-15.) Further, Plaintiffs had information which shows that they could have prompted an investigation and ultimately effected removal. (See Pekin Aff. in Opp. to POAM mot. for sum. judgment, Ex. C-2, Dep. of Lisa Willis pp. 29-31.) This deposition, taken on July 26, 2005, shows that had Plaintiffs presented any one or all of the three letters provided by POAM to Plaintiffs, dated July 19 and 24, 2003, to Equifax, Equifax would have first determined the authenticity of the letter and then would have contacted the writer of the letter at POAM. POAM would then have been required to investigate the account and to communicate the correct status of the account to AR, who would then inform Equifax to correct status of the account. (Opp. to

1 POAM Mot., Pekin Aff., Ex. C-2, pp. 29-31.) Lisa Willis

2 correctly described the process required when a consumer

3 contacts a consumer reporting agency. See, 15 U.S.C. §§ 1681g,

4 1681h, 1681i; see also 15 U.S.C. § 1681s-2(b) (describing the

5 duties of furnishers of information once they receive a notice

6 of dispute from a consumer reporting agency).

7 From the date Plaintiffs informed POAM of the collection on

8 the Equifax report on June 19, 2003, both POAM and AR acted

9 properly to effect removal of the erroneous collection from the

10 report. Further, on several occasions they followed up to

11 confirm that the matter had been corrected.

12 Plaintiffs complaint here addresses conduct that clearly

13 falls within the duties of furnishers of information as

14 described in § 1681s-2(a). Subsection (b) outlines the duties of

15 furnishers of information upon notice of dispute from the CRA.

16 Thus, the limitation set out in 1681s-2 applies, and

17 Plaintiffs cannot maintain a private cause of action for

18 defamation against these furnishers of information for violation

19 of the duties set out in § 1681s-2(a). These claims can only be

20 enforced by governmental agencies or officials as set out in

21 § 1681s-2(c).

22 Accordingly, the Court concludes that Plaintiff's claim for

23 defamation is preempted by the FCRA. Defendant POAM has

24 established that it is entitled to judgment as a matter of law.

25 V. The Defamation Claims

26 Although this case is preempted, in an abundance of

27 caution, the Court will assume that a claim for malicious

28 defamation exists and will proceed to analyze whether or not

24

Defendants have shown entitlement to judgment as a matter of law on the claims.

Defendant POAM contends in its memorandum in support of its motion that the claim fails because statements of Defendant POAM were not libelous; further, because Cal. Civ. Code § 47(c) bars a claim between interested persons without malice, Defendant is entitled to judgment as a matter of law, and Plaintiff is not entitled to punitive damages, because there is no issue of fact as to malice. (Memo. p. I.) POAM also argues that the libel claim of Plaintiff Lori Woods must fails as a matter of law because the collection reports at issue here were about Robert Woods only.

Defendant AR contends that any statements were not false (Memo. p. 15); after April 30, 2004, there is no evidence that Defendant AR intentionally published information to Equifax, and there is no evidence permitting an inference that Defendant AR's conduct was malicious (id. p. 16).

The parties agreed at the hearing on this motion that this case is controlled by the issue of whether or not there is a disputed issue of material fact with respect to malice sufficient to overcome the privilege afforded pursuant to Cal.Civ.Code 47(c). Therefore, the Court will address this issue first.

The Court will conclude that Plaintiffs failed to show publication of false statements after being informed of the error, and Plaintiffs cannot show malice.

A. <u>The Law of Defamation</u>

In California, defamation may be either by libel or

slander. Cal. Civ. Code § 44. Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. Cal. Civ. Code § 45. The elements are (1) an intentional publication, (2) which is false, (3) defamatory, and (4) unprivileged, and (5) which has natural tendency to injure or that causes special damage. Smith v. Maldonado, 72 Cal.App.4th 637, 645 (1999).

A publication is communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Id.

Where the words or other matters that are the subject of a defamation action are of ambiguous meaning, or are innocent on their face and defamatory only in the light of extrinsic circumstances, the plaintiff must plead and prove that as used, the words had a particular meaning, or "innuendo," that makes them defamatory. Smith v. Maldonado, 72 Cal.App.4th 637, 645-46 (1999). This includes the requirement that in an instance of ambiguous language, i.e., where the language is susceptible of either a defamatory or innocent interpretation, the plaintiff must also allege the extrinsic circumstances which show that the third person reasonably understood it in its derogatory sense (the "inducement"). Id. If the words themselves, under any circumstances, would convey to those who read or hear them a meaning within the statutory definitions of libel and slander, there is no need to plead an innuendo; and if the words under no

26

circumstances could convey a defamatory meaning, then no innuendo can make them defamatory. Id. (citing Washer v. Bank of America, 21 Cal.2d 822, 828 (1943)).

Whether a statement is reasonably susceptible of a defamatory meaning is a question for the Court. MacLeod v. Tribune Publishing Co., 52 Cal.2d 536, 546 (1959). A mere allegation of not paying debts is not defamatory per se. Gautier v. General Telephone Company, 234 Cal.App.2d 302, 309 (1965). It may be defamatory where it may be implied that a plaintiff failed to pay an obligation from dishonest motives or from a desire to defraud a creditor; further, it may be sufficient where there is an allegation that the plaintiffs were engaged in a vocation where credit is an important asset and necessary for the proper conduct of their business. Id. pp. 309-10. Further, where there are allegations in the complaint that it was understood as an allegation that the debtor never intended to pay and thus was dishonest and not worthy or any credit, it may likewise be defamatory. Ingraham v. Lyon, 105 Cal. 254, 257 (1894).

With regard to privileged communications, Cal. Civ. Code § 47(c) provides that a communication, without malice, to a person interested therein, 1) by one who is also interested, or 2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or 3) who is requested by the person interested to give the information, is privileged. This privilege is a codification of what is known as the common interest privilege pursuant to which the defendant bears the

27

initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then bears the burden of proving that the defendant made the statement with malice. Lundquist v. Reusser, 7 Cal.4th 1193, 1208 (1994). Where the complaint discloses a case of qualified privilege, i.e., such as where the statement was made upon a privileged occasion, no malice is presumed, and in order to state a cause of action, the pleading must contain affirmative allegations of malice in fact. Id. pp. 1209-12. A plaintiff must further present evidence sufficient to establish that the statement was made with malice. Id. p. 1210.

Plaintiffs here have conceded that the privilege of § 47(c) applies and that actual malice must be pleaded and proved to obtain judgment against the Defendants. (Pltfs.'s reply to mot. to dismiss and mot. to strike, Doc. 23, 2:20-25.) This concession appears to be correct. Roemer v. Retail Credit Co., 3 Cal.App.3d 368, 370 (1970) (applying it to mercantile agencies); Pavlovsky v. Board of Trade, 171 Cal.App.2d 110, 113-14 (1959) (applying it to credit reports of mercantile agencies that collect information and sell it for a profit).

Malice in defamation cases means actual or express malice, including a state of mind arising from hatred or ill will toward the plaintiff, or the state of mind demonstrated by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights. Roemer v. Retail Credit Co., 44 Cal.App.3d 926, 936 (1975); see, Frommoethelydo v. Fire Ins. Exchange, 42 Cal.3d 208, 217 (1986). Malice may be inferred

from facts showing a lack of reasonable or probable cause to believe in the truth of a defamatory statement; the privilege does not apply where there is a knowing lie or the making of a damaging assertion without any reasonable backing. <u>Stockton Newspapers, Inc. v. Superior Court</u>, 206 Cal.App.3d 966, 980 (1988) (disapproved on another ground in <u>Brown v. Kelly Broadcasting Co.</u>, 48 Cal.3d 711, 720 n.18 (1989)).

It is sufficient to allege what might otherwise be a legal conclusion regarding a subjective state of mind where specific facts are also alleged that would support the more general allegation. <u>Perkins v. Superior Court (General Telephone Directory Company)</u>, 117 Cal.App.3d 1 (1981) (allegations of repeated wrongful, intentional, and retaliatory republication in a directory of information known to be erroneous sufficed to allege malice where read not in isolation but in the context of all the allegations of the complaint). That Plaintiffs had not been notified of any deficiency and in fact had been told that no money was owed on the account may be considered. <u>See</u>, <u>Agarwal v. Johnson</u>, 25 Cal.3d 932, 945 (1979) (disapproved on another point in <u>White v. Ultramar, Inc.</u>, 21 Cal.4th 563 (1999)).

Further, oppression, fraud, or malice must be proven pursuant to Cal. Civ. Code § 3294, the pertinent statute concerning recovery of exemplary or punitive damages, by clear and convincing evidence. § 3294(a). Repeated publication, or authorizing repeated publication, of incorrect derogatory information can constitute a legally adequate basis for malice.

B. <u>Facts</u>

In compliance with Local Rule 56-260(a), Defendant POAM

filed a statement of undisputed facts which refers to supporting evidence contained in the file. The Court's statement of facts is based upon that statement as well as the record as a whole.

POAM provides monitoring and related security services to residential and commercial customers. Plaintiffs Robert and Lori Woods own property and now reside at 3101 Steinberg Road, Atwater, California. Before moving to Atwater, Plaintiffs owned a home at 343 Ward, Los Banos, California (Los Banos home). Plaintiffs contracted with POAM to provide services for their Los Banos home (First Account). The First Account was a two-year agreement for POAM to provide security services from December 2, 1999 through December 1, 2001. Plaintiffs agreed to pay $98.85 quarterly for the services for the entire two-year period, totaling $790.80. The quarterly charges for the First Account included monitoring and the value of the security devices installed in the home. POAM states that the security devices installed in homes of their clients are rarely re-installed into other homes because of the development of new technology and hardware. POAM arranged for the installation of a control communicator, yard sign, control pad, sounding device, interior intrusion detection devices, and three perimeter intrusion devices. The value of these items of equipment on the First Account was $724.00. (Moorman Decl. ¶4 & 5; Harwin Decl., Ex. A.)

On October 24, 2000, Plaintiffs contacted POAM to cancel services on the First Account as of October 31, 2000. A forwarding address for Plaintiffs' new residence in Atwater was provided. At the time of cancellation, Plaintiffs were not

current on their quarterly payments. No payment had been made for service provided from September 6, 2000, through December 5, 2000. Plaintiffs were billed in the amount of $489.92 for the prior quarter and the remainder of their contract term on October 27, 2000. This First Account was not carried over into a new account. (Moorman Decl. ¶¶ 6,7,8.)

The First Account contract terms provided that should a client move to a new home, a licensed authorized dealer would install a POAM Essential Security System at the new location free of charge under their free move certificate. To take advantage of the free move certificate, the clients must sign a separate twenty-four-month monitoring contract for the new location. (Harwin Decl. Exs. A, C; Moorman Decl. ¶ 8.)

On November 10, 2000, Plaintiffs requested that POAM provide protection services at their new Atwater home (Second Account).  The new protection system was installed in the Atwater home on November 13, 2000. (Harwin Decl. Ex. C; Moorman Decl. ¶¶ 8, 9, 10.)

Subsequent to cancellation of the First Account, POAM sent written communications to Plaintiffs' new Atwater address demanding payment of $489.92, which was due and owing on the First Account. Because POAM received no response to their attempts to collect payment of the First Account, POAM obtained the assistance of AR to recover the outstanding balance of $489.92 and collection costs totaling $607.50. (Moorman Decl. ¶¶ 11, 12; Petersen Decl. ¶¶ 3, 5.)

AR received Plaintiffs' collection account on May 14, 2001, and immediately sent Plaintiffs a validation notice, to the

Atwater address provided by POAM, informing the Plaintiffs of the past-due balance due to POAM, and providing thirty (30) days in which to request validation, that is, to dispute the validity of the debt and/or request proof of the debt. Plaintiffs did not respond. Further collection efforts were made by AR. On May 15, 2001, AR called the last known telephone number and found it disconnected. On May 17, 2001, AR sent a second validation notice to the Atwater address, the new address of Plaintiffs. Plaintiffs failed to respond to both letters, and because neither was returned as "undeliverable," it is believed both letters were delivered to Plaintiffs. Also, on May 21, 2001, AR searched the internet and telephone directories in an attempt to locate Plaintiffs' telephone number and inform them of the collection account. (Peterson Decl. ¶¶ 4-7.)

Because Plaintiffs failed to respond to AR's letters, AR reported Plaintiff Robert Woods to Equifax for non-payment of this debt on July 15, 2001. POAM did not request collection be made against Lori Woods, so AR did not provide her name, her Social Security number, or other personal information to Equifax. (Peterson Decl. ¶¶ 7-10.)

In June, 2003, Plaintiffs sought to refinance their Atwater property, which consists of a manufactured home on seventeen acres of land (Harwin Decl., Exs. G and H), and they discovered the existence of the collection on behalf of POAM which had been reported by AR to Equifax. (Petersen Decl. ¶ 7; Moorman Decl. ¶¶ 12-13.)

On June 19, 2003, Lori Woods contacted POAM regarding the outstanding debt and submission of it for collection. POAM

1  immediately submitted a request to the collections department at

2  AR to remove and close the collection account on the Los Banos

3  property to reflect that the account was paid-in-full. (Moorman

4  Decl. ¶¶ 17, 19; AR Reply filed May 20, 2007, Decl. of Steven

5  Peterson, ¶¶ 8, 9, and Exs. A and B.)[3]

6      On June 19, 2003, and again on June 23, 2003, POAM issued

7  letters to Plaintiffs stating that the matter had been

8  erroneously referred to collections. (Moorman Decl. ¶ 18; Harwin

9  Decl. Ex. D.)

10     On June 24, 2003, POAM called AR to confirm that the

11 account was marked paid-in-full. (Petersen Decl. 1, ¶ 16.)

12     On September 15, 2003, POAM called AR and requested that

13 the Woods collection be removed from credit bureau reporting,

14 and AR immediately notified Equifax to mark the Woods account as

15 cancelled "C." (Harwin Dec. Ex. J; Moorman Decl. ¶ 20; Petersen

16 Decl. 1 ¶ 15.)

17     This information is also set out in the Declaration 1 of

18 Steven R. Petersen, President of AR, at ¶¶ 12 through 18, which

19 states that on June 19, 2003, POAM contacted AR regarding the

20 Woods account and informed AR that the account was paid in full.

21 AR confirmed to POAM on June 24, 2003, that the account was

22 paid-in-full. On September 15, 2003, POAM again contacted AR and

23 requested that Robert Woods' account be removed from credit

24 bureau reporting, and AR immediately notified Equifax to mark

25 Mr. Woods' account as cancelled ("C"). (Moorman Decl. ¶ 20;

26

27 _____

        [3] There are two declarations from Steven Petersen. The first was submitted with
28 POAM's Motion for Summary Judgment, hereafter referred to as Petersen Decl. 1), and
   the second submitted with AR's Reply to Plaintiffs' Opposition of AR's Motion for
   Summary Judgment, hereafter Petersen Decl. 2)

1  Petersen Decl. 1, ¶¶ 12-18; Petersen Decl. 2, ¶¶ 8 - 11; Harwin
2  Decl. Ex. J.)

3      On April 30, 2004, Mary Moorman, the director of
4  collections for POAM, contacted AR to confirm that the Woods
5  account was removed from reporting. (Petersen Decl. 1, ¶ 16; AR
6  Reply, Exs. B and C.) These exhibits show that as of June 16,
7  2004, the records correctly reflected that the account was
8  cancelled. When Moorman called AR to confirm that the account
9  was removed from reporting on April 30, 2004, she requested
10 proof of the removal. AR then logged on to Equifax's internal
11 system on the same date and took a "screen shot" of the Equifax
12 screen which showed that the Woods' POAM collection account was
13 removed and coded "C" for cancelled. (Moorman Decl. ¶ 18; Harwin
14 Decl. Ex. D.)

15     Defendants took further efforts to confirm the status of
16 the information. On June 17, 2004, AR again logged on to the
17 Equifax internal system to re-confirm that the Woods account was
18 removed, and took another "screen shot" which showed the account
19 as cancelled. (Moorman Decl. ¶¶ 19, 29.)

20     Despite these efforts to clear Woods' record of the
21 derogatory account, the record reveals that the credit reports
22 for the dates June 11, 2003, July 7, 2004, and November 10, 2004
23 list the derogatory account. The credit report for Robert Woods
24 dated March 15, 2005, does not list a derogatory account.
25 (Harwin Decl. Ex. L.)

26     This inconsistency is explained through the declaration of
27 Steven R. Peterson, President of AR, as follows. On or about
28 November 10, 2004, AR chose to upgrade its computer software,

34

1  and to effect this change, AR contacted Equifax and requested

2  that all AR debtor files previously reported to Equifax be

3  removed from reporting (purging of accounts). (Petersen Decl. 1,

4  ¶¶ 19, 20; Petersen Decl. 2, ¶ 12; AR Reply, Prentiss Decl., ¶

5  4, Ex. D.) Jeff Prentiss, office manager and accountant for AR,

6  followed up on the purging process with Equifax, contacting

7  Equifax on November 11, 22, and 23, 2004. He provided

8  information requested by Equifax which they needed to effect the

9  purge. Prentiss was informed that the purge process would take

10  up to 45 days. (Prentiss Decl. ¶¶ 5-7; AR Reply, Exs. D - I.)

11      After November 10, 2004, when the purge occurred, AR did

12  not instruct or authorize Equifax to report any AR accounts.

13  (Petersen Decl. 1, ¶¶ 19-20; Petersen Decl. 2, ¶ 12.)

14      The e-mails exchanged between AR and Equifax have been

15  properly authenticated. (See AR Reply, Affidavit of Scott Houle,

16  the IT (Information Technology) supervisor for AR, pp. 2-5,

17  which explains Exs. J1-5, Internet Header Information for Exs. D

18  - I.) Exhibit K is a business card of Char Raymond of CSC which

19  shows the e-mail address that employees of Equifax use, which

20  further authenticates Exs. D - I. The Court has also considered

21  from AR's reply the affidavit of Wendy Marcisofsky, an

22  independent computer software trainer for accounts receivable

23  and e-mail. Ms. Marcisofsky explains how data is stored by AR in

24  its computer collection software and avers that no one can make

25  changes or modifications of e-mails or other computer entries

26  once it is stored in the system. The only way to effect changes

27  is to assign a new action code or do a "global edit," which

28  would show that another action had been made to effect a change.

Thus, Ms. Marcisofsky finds no irregularities or modifications in the screen shots that would indicate tampering of screen captures presented here. (AR Reply, Decl. C. Mundt, Ex. C 1-3.)

On or about January 20, 2005, AR's office manager, Jeff Prentiss, contacted Equifax to inquire if AR could begin reporting new accounts. The phone call was transferred to an Equifax technician who explained that during the purge, Equifax had encountered a computer error and as a result of the error, the accounts of several collection agencies, including AR, were reported under two numbers, one correct and one incorrect. The technician explained that Equifax corrected the error by restoring all of the purged accounts and re-purging the accounts under both numbers. (AR Reply, Prentiss Decl., ¶ 8; AR Reply Exs. D - I.)

On March 21, 2005, Prentiss contacted Equifax via e-mail to confirm that the Robert Woods account was removed from reporting. Prentiss referred to the Woods account, stating that AR had earlier asked that the Woods account be removed, and that AR had even purged all of its accounts from Equifax, so that the collection should not appear on the Woods credit report.

Equifax replied on March 22, 2005, stating that no collection was showing on the Robert Woods account. (AR Reply, Prentiss Decl. ¶ 9, Ex. I (e-mail response to Prentiss from Equifax).) It should be noted that Exhibit I shows the two numbers Equifax assigned to the Robert Woods account which caused Equifax to keep reporting the collection even though AR had ordered that it be removed.

On March 22, 2005, Petersen contacted Mary Moorman of POAM

and informed her that Equifax accidentally transposed the AR subscriber number for Robert Woods, which created an additional credit bureau report for Robert Woods (Petersen Decl. 1, ¶¶ 21, 22; Petersen Decl. 2, ¶¶ 12 - 13; AR Reply, Prentiss Decl. ¶ 9, Ex. I.)

AR advised POAM that Equifax was in the process of purging the erroneous data with regard to Robert Woods. (Moorman Decl. ¶ 23; Petersen Decl. ¶ 22.)

During the period January 2005 through March 2005, AR contacted Equifax numerous times to inquire about the Woods account, and AR was assured that the POAM account was not listed in the credit bureau. (AR Reply, Prentiss Decl. ¶ 10.)

Thus, the derogatory account on the Robert Woods reports after July 7, 2004, and November 10, 2004, up to July 2005, were the result of the error at Equifax. Although POAM and AR had confirmations from Equifax that after on or about June 19, 2003, the derogatory account on the Robert Woods report had been removed from the Equifax files, the error by Equifax resulted in the extra erroneous report remaining in Equifax records, and it was reported without the knowledge or authorization of either POAM or AR. (AR Reply, Petersen Decl. 2, ¶¶ 13, 14.)

C. Procedural Issues relating to the Motions

Plaintiffs' primary objection to AR's motion for summary judgment is that the motion does not satisfy the requirements of Fed. R. Civ. P. Rule 56(e), which requires affidavits based on the personal knowledge of the affiant setting forth facts that would be admissible at trial.

On May 21, 2007, the Court ordered AR to submit properly

authenticated and legible documents in support of their motion. On May 30, 2007, AR submitted a reply to Plaintiffs' opposition to summary judgment; attached were necessary exhibits, and the declarations and affidavits provided proper authentication of the documents. However, neither AR's motion nor the reply completely complies with Local Rule 56-260, which requires that the motion be accompanied by a statement of undisputed facts with citations to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish that fact. The moving party is responsible for filing with the Clerk all evidentiary documents cited in the moving papers. Local Rule 56-260(a).

Nevertheless, the Court notes that reading the original motion and the reply together provides the Court with the equivalent of a statement of undisputed facts.

Although Plaintiffs complain that AR failed to provide properly authenticated documents in violation of Fed. R. Civ. P. 56(e), Plaintiffs' opposition to the summary judgment motions of both AR and POAM fails to comply in any way with Local Rule 56-260(b), and Plaintiffs' authentication is sometimes questionable. Plaintiffs' pleadings and the affidavit of Mr. Pekin in support of the opposition to POAM's motion refer to deposition testimony in a particular exhibit. The exhibits and other attachments are not indexed or in any way identified. The Court was required to search through the unindexed attachments for the exhibit, only to find a page of deposition questions and answers with no identification of the person being deposed. Eq., Pekin Affidavit, Doc. 57-2, Ex. A through D, and F. The task of

indexing and tabbing the attachments and doing the seek-and-find
to identify the documents was time-consuming and should have
been unnecessary when dealing with an experienced attorney.
Plaintiffs followed none of the requirements set forth in Local
Rule 56-260(b), which provides, "Any party opposing a motion for
summary judgment... shall reproduce the itemized facts in the
Statement of Undisputed Facts and admit those facts that are
undisputed and deny those that are disputed, including with each
denial a citation to the particular portions of any pleading,
affidavit, deposition, interrogatory answer... relied upon in
support of that denial." Other options are listed in the rule,
none of which Plaintiffs have utilized. The language of the rule
is mandatory--not discretionary.

Only POAM's Motion and supporting documents complied
completely with Local Rule 56-260(a).

On June 7, 2007, POAM filed a motion to strike, objections
to evidence, and a request to strike evidence submitted in
support of Plaintiffs' opposition to motion for summary
judgment. POAM seeks to strike the affidavits submitted by Lori
A. Woods, Shirley Hable, and Barbara Williamson. Plaintiffs
could have, but did not, respond to this motion. POAM carefully
sets out the reasons in a detailed line-by-line discussion why
the three affidavits should be stricken. The objections appear
well taken, and in ruling on the motions for summary judgment
before the Court, the Court will give due consideration to the
objections.

Finally, the Court notes that in their opposition to AR's
motion for summary judgment, Plaintiffs purport to incorporate a

motion to strike all of the exhibits attached to AR's motion for summary judgment. The Court will consider Plaintiffs' opposition, but the motion to strike AR's exhibits is improperly presented, lacks specificity with regard to the documents involved, and will not be considered. Plaintiffs could have, but did not, file a proper motion to strike AR's exhibits because AR's motion for summary judgment was filed on March 2, 2007, and Plaintiffs had sufficient time to do so.

### D. Analysis of Malice

The Court begins its analysis by setting out two important concessions made by Plaintiffs.

Plaintiffs' opposition to POAM's motion for summary judgment, p. 14, reads as follows:

> 1. Asset Resources reported the Woods to Equifax in July, 2001. The derogatory information remained on Equifax's report until June, 2003 without the Woods' knowledge. That period is not actionable, not the subject of a tort because: 1) No known damage had been caused before June, 2003; and 2) Neither Protection One nor Asset Resources had been contacted by the Woods, and neither Defendant knew the derogatory credit information was false....

As previously noted, Plaintiffs also concede that pursuant to Cal. Civ. Code § 47(c), the communications involved here are privileged, and that actual malice must be pleaded and proved to obtain judgment against the Defendants. (Pltfs' reply to mot. to dismiss and mot. to strike of Deft. POAM, Doc. 22, p. 2.)

Plaintiffs contend that they have shown malice because Defendants lacked reasonable grounds for belief in the truth of the publication and acted in reckless disregard of the Plaintiffs' rights.

Because Plaintiffs concede that only the actions of

40

Defendants after June 2003 are actionable, the Court will examine later communications in determining who was responsible for the republication of the false credit information contained in the Woods Equifax credit report.

After Plaintiffs' discovery of the problem, Plaintiff Lori Woods contacted POAM; after being contacted, POAM immediately submitted a request to the collections department at AR to remove and close the collection account to reflect it as paid-in-full. On June 18, 2003, AR noted the collection account of Robert Woods paid-in-full in response to a call from POAM. (AR reply, Mundt Decl. ¶ 4, Ex. A.) After Plaintiff's contact on June 19, 2003, POAM immediately provided Woods with three letters stating that the account had been turned over for collection in error. (Harwin Decl. Ex. D.) On June 19, 2003, POAM called AR to confirm that the Woods account was noted paid-in-full. (Moorman Decl. ¶ 19, Petersen Decl. 1, ¶ 13.)

On September 15, 2003, the AR work card for Robert Woods shows AR received a call from POAM asking that the Woods collection account be marked cancelled "C," and removed. POAM requested confirmation of the change. (AR reply, Mundt Decl. ¶ 4, Ex. A.) On September 15, 2003, Steven Petersen, president of AR, confirmed to Mary Moorman, POAM director of collections, via e-mail that the Woods account was removed from the credit bureau. (Moorman Decl. ¶ 20; Harwin Decl. Ex. J.)

On April 30, 2004, Mary Moorman of POAM contacted AR for confirmation and proof that the Woods collection account had been removed from reporting. (Petersen Decl. 1, ¶ 16.) Steven Petersen, president of AR, logged on to the Equifax internal

system to view the Woods account and confirm that the Woods account had been removed. AR took a screen shot of the screen showing the Woods account was removed. These shots confirmed that the account was marked "C" on April 30, 2004. (Harwin Decl. ¶ 1, Ex. Q; Petersen Decl. 2, Ex. B.)

On June 17, 2004, AR again logged on to the Equifax internal system and viewed the Woods account to re-confirm that the account was properly marked "C." (AR Reply, Mundt Decl. ¶ 6, Ex. C.) The June 17, 2004, screen shot shows no derogatory from POAM.

It is clear from the above listing of communications among POAM, AR and Equifax, that between June 19, 2003 and September 30, 2003, and after September 30, 2003, there was no publication of defamatory credit information about Robert Woods by Defendants. The evidence confirms that the communications concerning the Robert Woods' Equifax credit report through September 30, 2003, were efforts to correct the error reported to them on June 19, 2003, and they were not responsible for any publication or re-publication of erroneous information during the period June 19, 2003 through September 15, 2003. Additionally, in an abundance of caution, Defendants confirmed that the account was corrected by logging onto the Equifax internal system and viewing the Woods account on April 30, 2004, and June 17, 2004, to confirm that the account was removed.

Plaintiffs contend that the first correction made by POAM to AR and reported to Equifax on June 18, 2003, showing the Woods account had been paid-in-full, was of no help to Plaintiffs. A "PIF," or paid-in-full, notation would still depress the credit score because PIF indicates that the account was not paid until

it went to collections, and such a notation on a credit report continues to depress the credit score. Plaintiffs argue that this notation is precisely what they sought to avoid when they filed the lawsuit.

Defendants determined, on their own, that the report of PIF was incorrect and made the correction without prompting by the Plaintiffs. On September 9, 2003, Tammy Johnson of AR received a call from POAM to check on the status of the account. AR confirmed that the account reflected the collection was PIF. On September 15, 2003, AR was instructed by POAM to change the Woods POAM collection from "PIF" to "cancelled." On the same date Steven Petersen of AR sent an e-mail to POAM confirming, per the instructions of POAM, that the Woods collection was removed from the credit bureau. (Petersen Decl. 1, Ex. J.)

In addition, the AR work card of Robert Woods reveals no evidence that any further inquiries from financing companies into the Woods account occurred in the three-month period from June 19, 2003, through September 15, 2003. Only the inquiry by Hadle Financing on June 11, 2003, is shown. Thus, Plaintiffs have not shown any harm from this short period of time when the account reflected the collection paid-in-full rather than cancelled.

The three-month period of time the account was reported as paid-in-full is not excessive. While this error in reporting by POAM is unfortunate, there is no evidence warranting an inference that it was done with a state of mind arising from hatred or ill will toward Plaintiffs, or with reckless disregard for the Plaintiffs' rights. Defendants were attempting to correct the error promptly upon notice from Plaintiffs.

43

Plaintiffs argue that once the collection had been entered on their credit report, there were only two ways that it could be removed, that is, by payment or by removal. Through the testimony of Lisa Willis of Equifax, Plaintiffs contend that they have shown that the only way the March 11, 2005, credit report could show removal of the collection is by the permission of POAM or AR. Plaintiffs argue that the three letters POAM provided to them were useless because even if they had given them to Equifax, no action could be taken. (Plaintiffs' opp., aff. of Pekin, Dep. of Lisa Willis, Ex. 2a, b, c.)

However, Plaintiffs' interpretation of the deposition testimony of Lisa Willis is inaccurate. Her testimony that the only entity that could correct the incorrect collection would be the collection agency is accurate. However, Willis' testimony did not end there. She stated that had such a letter been presented, she would first determine the authenticity of the letter by contacting the writer to confirm it was authentic. She would then contact the person who signed the letter and advise them to contact the collection agency to get an update of the account. She then stated: "But in receiving the letters, that would not – we wouldn't just say, oh, this is not from the collection agency and discard the letters. We would use those to further investigate the issue." (Opp. to POAM mot., Pekin aff. ¶ C, Ex. C-2, p.31:3-6.) This information is repeated several times in the deposition. (Ex. C-2, p. 30:16-25; Ex. C-5, pp. 64:1-25; 65:3-25; 66:1-5.)

Pursuant to the FCRA, Willis set out exactly the procedure required when a CRA receives a complaint from a consumer, or a

consumer disputes information on a credit report. See 15 U.S.C. §

1681s-2(b). There is no issue of material fact raised with

respect to this readiness on the part of Equifax to undertake an

investigation. As to whether an issue of credibility is present,

it is established that a general challenge is insufficient to

raise an issue of fact regarding credibility; rather, specific

facts must be set forth that raise an issue of fact. Department

of Commerce v. United States House of Representatives, 525 U.S.

316, 330-31; National Union Fire Ins. Co. of Pittsburgh, Pa. v.

Argonaut Ins. Co., 701 F.2d 95, 96-97 (9th Cir. 1983). A mere

desire to cross-examine witnesses or a hope to undermine their

credibility at trial is not sufficient to avoid summary judgment.

National Union Fire Ins. Co., 701 F.2d at 96-97. Had Plaintiffs

contacted Equifax with the letters in June 2003, Equifax would

have been required to investigate the matter. In view of the

actions taken here by the Defendants, had Plaintiffs contacted

Equifax, the collection would have been cancelled by AR at the

direction of POAM. In fact, POAM did contact AR, and the

collection was removed correctly by September 15, 2003.

The Court finds at this point that POAM and AR have provided

evidence that requires the inference that when they were informed

that the POAM Robert Woods collection was on the Equifax report,

they acted appropriately and promptly to remove it, not re-

publish it. The Defendants have provided credible documentation

that shows that the Robert Woods POAM collection had been removed

from the Equifax credit report of April 15, 2004, and June 17,

2004. (See AR Reply, Prentiss Decl. ¶¶ 10, 11, AR Mot. Sum. Jmt.,

Exs. B, C.) Because of the previously mentioned credit reports,

Defendants had no reason to inquire further about the account from Equifax. In addition, none of the mentioned communications for which these Defendants were responsible published any derogatory information about the Plaintiffs. Thus, none of these publications or re-publications will support a finding of malice.

However, the information discussed does not explain why the Equifax credit reports of June 11, 2003, July 7, 2004, and November 10, 2004 continued to reflect the derogatory collection, but the March 11, 2005, does not show it. (Harwin Decl. ¶ 14, Exs. L1-4.) The credit reports referenced above show that the Woods derogatory continued to be published after these Defendants had confirmation that the account had been corrected.

Plaintiffs contend that it was not until March 11, 2005, that the collection had been cancelled and no longer appeared on the credit report. (See Decl. Harwin, ¶ 14, Ex. L-4.) They contend that the Defendants are responsible for the re-publication of the derogatory information from June 2003 through July 2005.

Defendants have provided sufficient evidence to show that the credit reports from Equifax on April 15, 2004, through June 17, 2004, did not show the POAM collection account. They had no reason to request credit reports after those dates because they had twice confirmed that Equifax had removed the POAM collection from the Woods credit account. If the derogatory information about Woods continued to be published, it was not through anything these Defendants were responsible for entering on the Woods' Equifax credit report.

Nevertheless, Plaintiffs continue to argue that Defendants,

46

particularly AR, must have been responsible for the derogatory disappearing from the Woods credit report. Plaintiffs allege, based upon Willis' answers in her deposition, that only AR could instruct Equifax to remove the derogatory from the credit report.

Plaintiffs state that they have tried to determine who instructed Equifax to remove the account from the report of March 2005, and so they propounded to AR Special Interrogatories on March 1, 2007. Plaintiffs acknowledge the responses were timely answered. The questions, numbered 15 through 18, propounded by Plaintiffs asked how, when, and by whom the POAM derogatory was removed from the Equifax reporting system and also asked for the identification of each document that shows how the derogatory was removed. (Pltfs.' Opp. to AR Mot., Pekin aff. ¶ 1, Ex. 1A.) Defendants responded (id., at Ex. 1B) that they were ignorant of the internal business practices of Equifax; that to the best of their knowledge, based upon their motion for summary judgment, the account was removed as early as April 30, 2004, and it was believed that it was removed immediately on June 18, 2003, when AR first requested the removal. With respect to identification of witnesses and documents, AR responded that Plaintiffs should refer to their motion for summary judgment.

The Court finds these answers to be sufficient and appropriate. Further, both AR and POAM provided ample evidence of how the March 11, 2005, Equifax credit report came to show no POAM collection, and Plaintiffs, rather than recognize the reasonable inferences to be drawn from the evidence or submit evidence supporting an inference of participation by Defendants, argue blindly that Defendants failed to respond to the

interrogatories. Plaintiffs' argument that the Defendants had the evidence exclusively in their possession, and that the Court should therefore apply res ipsa loquitur, is without basis in fact or law.

Plaintiffs were admittedly dilatory in conducting their discovery throughout the entire prosecution of this case both in state as well as federal court. (Decl. of Michael Pekin in supp. of mot. to file first amended complaint, attached as Ex. P to POAM Harwin Declaration.) At the scheduling conference on February 12, 2007, the Court was obliged to order Plaintiffs to propound some sort of discovery on AR by March 1, 2007. AR filed its motion for summary judgment on March 2, 2007, so AR, which filed timely responses to the interrogatories, was well within its rights to refer Plaintiffs to its motion. Further, Defendants' motions for summary judgment set out in detail the occurrences during November 2004 through January 2005, that resulted in the Woods collection account reappearing on the credit report, and how it was subsequently removed.

Without repeating all the facts set out by the parties and in the Court's own statement of facts, the Court finds the evidence provided by AR about how the Woods POAM collection account appeared on credit reports after June 17, 2004, is complete, admissible, and does not permit a rational trier to infer that Defendants were responsible for the reappearance of the account. Defendants' proper reaction to the notice of the erroneous collection on the Woods credit report was confirmed on April 30, 2004, and June 17, 2004. Defendants were justified in considering the matter corrected. After AR's upgrading of its

48

1  computer software beginning in November 2004 and the purging,

2  restoration, and repurging by Equifax of previously reported AR

3  accounts during March 2005, a credit report of March 11, 2005, no

4  longer reported the derogatory account. (See AR Reply, Prentiss

5  Decl. ¶¶ 4-9, Exs. D, E, F, G, H, I; Harwin Decl. ¶ 11, Ex. L-4.)

6       It is apparent from all of the above that neither of the

7  Defendants published false information with regard to the

8  Plaintiffs from the date they were informed by Lori Woods that

9  there was an error, June 19, 2003. Any reports from Equifax which

10  reflected the derogatory information from that date forward are

11  the fault of Equifax. Plaintiffs have had many opportunities to

12  include Equifax as a defendant, and they either failed or refused

13  to do so.[4] If Plaintiffs had properly pursued the prosecution of

14  this case and had made timely discovery motions, they would have

15  possessed knowledge of the subsequent actions of Defendants that

16  revealed how Equifax finally removed the derogatory.

17

18       In summary, because of federal preemption of the defamation

19  claim, Defendants are entitled to judgment as a matter of law.

20  Further a rational trier of fact could not find that Defendants

21  were responsible for the re-publication of the Woods' derogatory

22

23       [4] The original complaint and amended complaint named only POAM as a
    defendant. The first amended complaint added AR but still did not add Equifax.
24  After AR removed the case to this Court, Plaintiffs again requested leave to
    amend, but the Court denied the motion because the only purpose was to attempt
25  to name defense counsel for POAM as an agent of POAM who was personally
    responsible for repeated re-publication of the derogatory during defense of
26  the case. In the order denying the motion to amend, the Court noted that while
    there had been informal discussions with the Court and defense counsel about a
27  proposed second amended complaint (SAC), "those discussions have focused on
    the desire and/or perceived need to have Equifax as a party in this case. In
28  fact, Plaintiffs' counsel has challenged and at times seemingly begged defense
    counsel to cross-claim against or implead Equifax if they think Equifax is
    necessary in this lawsuit." (Order denying mot. to file SAC, p. 9:23-28.)

credit information after they were informed of its existence in
June 2003; all of their communications were aimed at correcting
the error, and the republication was the fault of Equifax, which
erroneously created two Woods accounts, and the error was not
discovered until 2005 during the purging of AR's accounts.
Finally, if the issue of malice is reached, then considering
Plaintiffs' concessions, Defendants have established that there
is no disputed issue of fact as to malice; a rational trier of
fact could not find from the evidence presented that Defendants'
conduct was malicious by clear and convincing evidence.
Plaintiffs' failure to submit evidence sufficient to warrant a
reasonable inference of malice causes their claim and their
prayer for punitive damages to fail.

VI. Disposition

Accordingly, it is ORDERED that

1. The motion to strike of Defendant Protection One Alarm
Monitoring, Inc., IS DENIED; and

2. The amended request for judicial notice of Defendant
Protection One Alarm Monitoring, Inc. IS GRANTED, and the
original request for judicial notice IS DENIED as moot; and

3. The motion of Defendant Assets Resources, Inc. for
summary judgment IS GRANTED as to both Plaintiffs; and

4.  The motion of Defendant Protection One Alarm Monitoring,
Inc. for summary judgment IS GRANTED as to both Plaintiffs; and

5.  The Plaintiffs' request for attorneys fees included in
Plaintiffs' attached Affidavit, at p. 3, for defense of Asset
Resources Motion for Summary Judgment IS DENIED.

//////////

1 | / / / / / / / / /

2 | / / / / / / / / /

3 | IT IS SO ORDERED.

4 | **Dated:    August 16, 2007**                    **/s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE